FILED
U.S DISTRICT COURT

2006 FEB 23  P 3: 01

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

C. Richard Henriksen, Jr., #1466
Timothy J. Williams, #10850
HENRIKSEN & HENRIKSEN, P.C.
Attorney for Plaintiffs
320 South 500 East
Salt Lake City, Utah 84102
Telephone: (801) 521-4145
Facsimile:  (801) 355-0246

Phillip Kim
Laurence Rosen
THE ROSEN LAW FIRM, P.A.
350 Fifth Avenue, Suite 5508
New York, NY 10118
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STAN OVERTON, individually and as TRUSTEE OF THE MAY 17, 2003 BARON ST. JOHN REVOCABLE LIVING TRUST;<br><br>Plaintiffs,<br><br>vs.<br><br>ATLAS STOCK TRANSFER CORPORATION ,<br><br>Defendant. | **FIRST AMENDED COMPLAINT**<br><br><br><br>Civil No. 2:06cv00153 BSJ<br><br>Judge Bruce S. Jenkins |

Plaintiff, **STAN OVERTON, individually and as TRUSTEE OF THE MAY 17, 2003**

**BARON ST. JOHN REVOCABLE LIVING TRUST,** by his attorneys, HENRIKSEN &

HENRIKSEN, P.C. and **THE ROSEN LAW FIRM, P.A.,** allege as follows:

## PRELIMINARY STATEMENT

1. This diversity action for arises from Defendant's failure to remove restrictive legends and issue non-restricted shares of Recom Managed Systems, Inc. ("RECOM") common stock owned by Plaintiff. Since May 17, 2003, Plaintiff has continuously owned two Share Certificates of restricted common stock of RECOM for 58,888 and 29,444 shares, respectively. Despite submitting opinion letters from counsel to defendant Atlas Stock Transfer Corporation ("Atlas"), authorizations for transfer containing guaranteed signatures of Plaintiff, and numerous other requests starting in August of 2005, Atlas has refused to remove the restrictive legends from the share certificates and issue new share certificates without the restrictive legends, and thereby prohibiting Plaintiff from freely trading the RECOM stock and foreclosing Plaintiff from deriving any benefit from the stock that he is entitled to.

2. As a direct result of Defendant's failure to remove the restrictive legends on the Share Certificates, Plaintiff has suffered damages.

## THE PARTIES

3. Plaintiff Stan Overton is a citizen of the United States and the State of Florida. Mr. Overton resides in Orlando, Florida. Mr. Overton sues defendants individually and as Trustee of the May 17, 2003 Baron St. John Revocable Living Trust, a California Trust.

4. The May 17, 2003 Baron St. John Revocable Living Trust (the "Trust"), is a trust organized under the laws of the State of California and maintains its principal place of business in Orlando, Florida.

5. Defendant Atlas Stock Transfer Corporation, ("Atlas") is a privately held Utah Corporation with offices located at 5899 S. State, Suite 24, Salt Lake City, UT 84107. Upon information and belief, Atlas is primarily engaged in the business of acting as a transfer agent as defined by the federal securities laws.

### RELEVANT NON-PARTY

6. Recom Managed Systems, Inc. is a publicly traded Delaware Corporation with its principal place of business located at 531 South Main Street, Suite 301, Greenville, South Carolina, 29601. On November 9, 2005, RECOM changed its name to Signalife, Inc. (collectively hereafter "RECOM"). RECOM's stock is traded on the American Stock Exchange ("AMEX") under ticker symbol "SGN."

### JURISDICTION AND VENUE

7. Jurisdiction is based on Diversity of Citizenship pursuant to 28 U.S.C § 1332, as the citizenship of the named parties are diverse and the matter in controversy exceeds seventy five thousand dollars ($75,000), exclusive of interest and costs.

8. Venue is proper in the District of Utah Central Division pursuant to 28 U.S.C § 1391(a)(1) and (2) as defendant resides in this district and a substantial part of the events that give rise to this action occurred in this district.

### FACTUAL ALLEGATIONS

9. On May 17, 2003 two share certificates bearing nos. 3790 and 4287 of restricted RECOM common stock for 29,444 and 58,888 shares, respectively, (collectively "Share

Certificates") were transferred from non-party Baron St. John ("St. John") to the Baron St. John Revocable Living Trust, Stan Overton, as Trustee.

10. St. John was issued the Share Certificates on or about October 23, 2002 pursuant to an unrelated settlement agreement between him and non-party Budimir Drakulic, a RECOM officer. (See Exhibit "A", attached.)  The Share Certificates were issued to St. John and other nonparty investors in consideration for $34,000 and the release of all claims against Drakulic arising from another business venture.  Neither RECOM, nor the parties to this action, were parties to that unrelated settlement.

11. The Share Certificates transferred to Plaintiff contained the following Rule 144 restrictive legend:

> The shares represented by this certificate have not been registered under the Securities Act of 1933.  The shares have been acquired for investment and may not be altered sold or otherwise transferred in the absence of an effective Registration Statement for the shares under Securities Act of 1933 or a prior opinion of counsel satisfactory to the issuer that registration is not required under the Act.

12. On August 16, 2005 Overton transmitted two letters to Atlas (one for each Share Certificate) requesting that Atlas issue new Share Certificates without the restrictive legends set forth in ¶11, above, or any other restrictions of transfer be issued to him.  The letter also advised that Atlas that they would be receiving an opinion letter from his special securities counsel, Robert M. Strumor, Esq. certifying that the transfer of the securities did not violate the securities laws.

13. On August 17, 2005 two opinion letters (for each of the Share Certificates), drafted by Mr. Strumor, were provided to Atlas requesting that Atlas issue new Share Certificates without any restrictive legend or other restriction on transfer registered in the name of Overton. The August 17, 2005 opinion letters in all relevant aspects were the same.  The letters state that in the opinion of Mr. Strumor: (1) the Common Stock was duly authorized and validly issued by the Company; (2) Overton acquired the common stock on or about May 17, 2003 and has been the registered owner continuously since September 26, 2003 (58,888 shares) and December 14, 2004 (29,444 shares) and is entitled to Section 4 (1/12) exemption for private transactions; (3) Overton is not an affiliate of the Company as defined in the Securities and Exchange Act of 1933 ("1933 Act") or in Rule 144 nor was an affiliate 90 days preceding the date of the opinion letters; (4) Overton is lawfully entitled to the exemption from the registration requirements of the 1933 Act provided in the provisions provided in Rule 144, and has satisfied the two year holding period requirement and therefore may be issued new Share Certificates without restrictive legend or any other restrictions on transfer or sale; and (5) no other opinions were necessary for Atlas to remove the restrictive legends from the Share Certificates.

14. At the close of trading on the AMEX on August 17, 2005, the Share Certificates had a market value of $291,495 based on the $3.30 a share price.

15. On or about August 18, 2005, Overton sent authorizations, containing his guaranteed signature, to Atlas to transfer his Share Certificates to the Allan Migdall Attorney Trust Account in furtherance of the sale of the Share Certificates to a bona fide purchaser for value.

16. By letter dated September 21, 2005, Mr. Strumor sent another request to Atlas demanding that the restrictive legends be removed from the Share Certificates.

17. By letter dated September 29, 2005, RECOM, through counsel, Paul M. Taylor, Esq., informed Atlas that "under no circumstances" should Atlas issue, replace, or otherwise deal with the Share Certificates due to a purported breach of an agreement St. John entered into in 2002, presumably the settlement agreement between St. John and Drakulic, to which neither RECOM, the Trust, nor Overton was a party to.

18. By letter dated October 10, 2005, Atlas notified RECOM that the Share Certificates have been presented to Atlas from Overton for registration of transfer.  Atlas stated in the letter that "[I]t appears that the certificates are in due form for registration of transfer...."  The letter further states Atlas "shall proceed to register the transfer as requested" unless RECOM "do one of the following":

> Obtain an appropriate restraining order or injunction issued by a court of competent jurisdiction;
>
> Furnish to us a satisfactory indemnity bond protecting Prevectus Pharmaceuticals, Inc. [sic] transfer agent and registrar, or other agent or employees from any loss which it or they may suffer by reason of refusal to register transfer if [sic] the securities as requested.

19. By letter dated October 12, 2005 Mr. Strumor, reminded Atlas of its independent duties owed to Overton and that the purported basis proffered by RECOM in the September 29, 2005 letter did not provide a basis for Atlas not to remove the restrictive legends from the share certificates.

20. By letter dated October 21, 2005, RECOM reiterated its prior instructions to Atlas not to transfer or lift any restrictive legends from the Share Certificates. The letter further states that "If you intend to lift the legends .... notwithstanding our instructions to you, please immediately notify me in writing...."

21. To date the restrictive legends on the Share Certificates have not been removed, nor has RECOM posted bond or obtained judicial intervention as outlined in Atlas' October 10, 2005 letter, set forth in ¶18 above.

22. As a result of Atlas' failure to transfer the shares and remove the restricted legend, the Trust and Overton have been unable to transfer or sell the Share Certificates.

## CHOICE OF LAW

23. Under the Utah UCC §70A-8-109 the law of the issuer governs transfer duties. The issuer being RECOM, a Delaware Corporation, the Delaware UCC applies to transfer duties in this action.

## <u>COUNT I</u>

## WRONGFUL REFUSAL TO REGISTER THE TRANSFER OF SECURITIES UNDER DELAWARE U.C.C.

24. Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

25. Section 8-401 of the Delaware U.C.C. provides:

      (a)    If a certificated security in registered form is presented to an issuer with a request to register transfer . . the issuer shall register the transfer as if:

    (1)    Under the terms of the security the person seeking registration of transfer is eligible to have the security registered in its name;

    (2)    The endorsement or instruction is made by the appropriate person;

    (3)    Reasonable assurance is given that the endorsement or instruction is genuine and authorized;

    (4)    Any applicable law relating to the collection of taxes has been complied with;

    (5)    The transfer does not violate any restriction on the transfer imposed by the issuer in accordance with section 8-204;

    (6)    A demand that the issuer not register transfer had not become effective under section 8-403 or the issuer had complied with section 8-403(b) but no legal process or indemnity bond is obtained as provided in section 8-403(d);

    (7)    The transfer is in fact rightful or is to a protected purchaser.

6 Del. C. §8-401.

26. As the transfer agent for RECOM stock, Atlas has the same mandatory duty to register the transfer of the RECOM stock as does RECOM pursuant to sections 8-401 and 8-407 of the Delaware Uniform Commercial Code, 6 Del. C. §§ 8-401, 8-407.

27. Section 8-407 provides that a transfer agent, with regard to the registration of a transfer of securities, "has the same obligation to the particular functions performed as the issuer has in regard to those functions." 6 Del. C. § 8-407. Thus, Atlas had the same obligations with regard to the registration of the transfer of stock as RECOM, the stock issuer.

28. Atlas is thus similarly bound to follow, and liable for damages to plaintiffs under §8-401.

29. Plaintiff has satisfied all conditions listed in section 8-401 of the Delaware UCC.

30. By failing and refusing to effect and to remove the restrictive legends on the Share Certificates as set forth above, Defendant is preventing the transfer and registration of RECOM stock despite the fact Plaintiff is entitled to do so.

31. As a result of defendants' failure and refusal to remove the restrictive legends to facilitate the transfer of the RECOM stock, Plaintiff is unable to freely trade the stock and realize any benefit therein, and accordingly, Plaintiff has suffered damages of at least $291,495, which is the value that the RECOM stock would have had if sold when requested.

## COUNT II

### CONVERSION

32. Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

33. By failing to remove the restrictive legends from the RECOM Share Certificates and replacing the stock certificates without the legend and having the exclusive power and control to do so, Defendant has, without any privilege, interfered with Plaintiff's possession and enjoyment of the RECOM Share Certificates, which he owns and has a pecuniary interest in.

34. As a result of Defendant's conversion of the stock certificates, Plaintiff has suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, STAN OVERTON, individually and as TRUSTEE OF THE MAY 17, 2003 BARON ST. JOHN REVOCABLE LIVING TRUST demands judgment in his favor

and against Defendant ATLAS STOCK TRANSFER CORPORATION, as follows:

    a.   Award Plaintiff compensatory damages in the amount of $291,495, the market value of the RECOM Share Certificates on August 17, 2005;

    b.   Award Punitive damages based on Defendants' reckless indifference to Plaintiff's rights;

    c.   Award Plaintiff attorneys' fees, costs, and such other and further relief the Court deems just and proper.

    DATED this _23_ day of February, 2006.

               HENRIKSEN & HENRIKSEN, P.C.

               C. Richard Henriksen, Jr.
               Timothy J. Williams
               320 South 500 East
               Salt Lake City, Utah 84102
               Tel. (801) 521-4145
               Fax: (801) 355-0246

               Phillip Kim
               Laurence Rosen
               THE ROSEN LAW FIRM, P.A.
               350 Fifth Avenue, Suite 5508
               New York, NY 10118
               Telephone: (212) 686-1060
               Facsimile: (212) 202-3827

               Attorneys for Plaintiffs

# EXHIBIT "A"

## SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASES

THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASES ("Agreement") is made and entered into as of this 2 day of October, 2002, by and between Drdiano Drakulic (hereinafter "Drakulic"), on the one hand, and the investors executing this Agreement below, on the other hand (hereinafter "Investors").

## RECITALS

A.    WHEREAS, the investors claim to have invested money in a company called Advanced Heart Technologies, Inc. ("AHT"), with the amount of their claimed investments as set forth on Schedule "A" and with either (i) copies of their supporting documentation submitted to Drakulic prior to the fifth (5th) business day before the Closing Date (as defined below), or (ii) signed affidavits in the form attached hereto as Exhibit "1." All Investors represent and warrant that to the best of their knowledge, their investments in AHT as referenced and set forth in this Agreement were made in full compliance with all federal and state securities laws, as well as in compliance with all applicable laws, rules, regulations and other provisions relating to investments in general;

B.    WHEREAS, many years prior to the formation of AHT and many years prior to any interaction between the Investors, on the one hand, and Drakulic, on the other hand, Drakulic had developed certain technologies (including, but not limited to, patented and trade secreted technologies) pertaining to measuring bodily functions, some of which were licensed to Teledyne in 1993, under that certain licensing agreement dated December 9, 1993 ("Teledyne License") for purposes of developing certain brain wave technologies. As of the date of the Teledyne License, none of the Investors had ever met Drakulic whether directly or indirectly. As of the date of this Agreement, Teledyne continues to license the technologies developed by Drakulic under the Teledyne License. All of the technologies developed by Drakulic prior to March 1, 2002 are referred to hereinafter as "technologies."

C.    WHEREAS, Drakulic claims (i) the initial purpose of AHT at the time of its formation was to permit AHT to license from Drakulic the technologies for purposes of creating heart monitoring devices and (ii) to have extensive legal rights against numerous persons, including, but not limited to, persons related to AHT, persons related to the Investors, and persons related to the circumstances surrounding the formation and operation of AHT, including, but not limited to, an extensive conspiracy claimed by Drakulic to have existed among numerous persons for the purpose of inducing Drakulic to use and disclose his time, ideas, methodologies, and a significant part of his life, to a company, AHT, that Drakulic claims was intended by all such co-conspirators to be under-capitalized in comparison to the representations made to Drakulic to induce his involvement with AHT;

Initials: _____

Settlement Agreement and Mutual General Releases



D)       WHEREAS, the Investors have made inroads against Drakulic with claims that Drakulic has not only violated civil laws but has been in their opinion violations in connection with his involvement with AHT including "insurance tax fraud," "bankruptcy fraud" and other alleged unlawful acts, and criminal activity including the acts by Drakulic of covering-up, together with AHT, and terminating any lines of settlement appertaining to the relationships;

E)       WHEREAS, Drakulic claims that the threats made against him constitute extortion and are themselves criminal acts, not to mention, Drakulic's claims that each and every act he has taken was lawful, legitimate and justified under the civil and criminal laws applicable to him pursuant to State and Federal law.

F)       WHEREAS, Drakulic and the Investors deny all allegations made against them by the others and deny any wrongdoing of any kind;

G)       WHEREAS, the parties hereto wish to settle and resolve all allegations and claims between them in the manner set forth in this Agreement.

H)       WHEREAS, the Investors hereby acknowledge that Steve Verchick has performed extraordinary services and diligent efforts in securing this Agreement and that he has previously lost certain options granted to him by AHT in connection with his initial investment therein. Mr. Verchick will receive certain warrants to purchase shares in the public company described herein. Notwithstanding, the warrants granted Mr. Verchick will not be included in the amount calculated as consideration for the settlement of the Investors. All Investors covenant and agree and recite that they are aware of and acknowledge Mr. Verchick's rendering of such service and the extraordinary value thereof.

NOW, THEREFORE, in consideration of the promises, mutual covenants and obligations set forth herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT

1.       Payment to Drakulic's Designee.  The Investors shall pay to the designee of Drakulic the total sum of $34,000.00 (thirty four thousand dollars), to be divided as an obligation among the Investors in any manner they see fit, and payable by one cashier's check made payable to Drakulic's lawyer's trust account and delivered at the Closing, as that term is defined below. The cashier's check shall be made payable to Brian Oxman, Esq. Drakulic represents, warrants and agrees that such cashier's check shall go directly into the operating account of the public company described below and shall be used for operations with respect to that public company and not for the reimbursement of legal fees with the sole exception that the cashier's check may be used for legal fees connected with patent work on future patent applications or maintenance

Initials: _____

work of any character to prepare any documents for the benefit of the public company described below.

_____ Delivery of Consideration to Investor.  Purchaser shall assure that the Investors receive, in the form of consideration, the following consideration:

(a) an amount of shares of restricted common stock (under Rule 144) in a public company (or public feature) set forth in Schedule B attached hereto.  The amount of shares shall be in the precise amount set forth opposite the names of the Investors as set forth on Schedule B, and shall be in certificates duly authorized for issuance by the Board of the public company and duly issued by its transfer agent for the public company; and

(b) a fully executed agreement by the public company in the precise form attached to Schedule B and identified as Schedule B-1

3.   **Third Party Beneficiaries.**  There are no third party beneficiaries of this Agreement unless otherwise stated.

4.   **Severability.**  Any portion or provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining portions or provisions hereof in such jurisdiction or, to the extent permitted by law, without rendering that or any other portion or provision hereof invalid, illegal or unenforceable in any other jurisdiction.

5.   **Equitable Remedies.**  In addition to legal remedies to the extent allowed pursuant to this Agreement or by law, in recognition of the fact that remedies at law may not be sufficient, the parties hereto (and their successors) shall be entitled to equitable remedies including, without limitation, specific performance and injunction.

6.   **Article and Section Headings.**  The Article and Section headings included in this Agreement are for the convenience of the parties only and shall not effect the construction or interpretation of this Agreement.

7.   **Counterparts.**  This Agreement may be executed in several counterparts, each one of which shall be an original and all of which shall constitute one and the same document.

8.   **Fees and Expenses.**  Each party shall pay all fees and expenses, however, described, incurred by them in connection with this transaction

9.   **Notices.**  Any notices which any party is required or may desire to give to any other party or parties under this Agreement shall be in writing, and shall be given by addressing

Initials: _____

3

the same to each such party or parties at their addresses listed on the signature pages of this Agreement, and by depositing the same so addressed, postage prepaid, certified mail, return receipt requested, in the United States mail, by delivering the same personally to such other party or parties or by other means facsimile. A party may change the address for the service of notice by written notice given to the other parties in the manner herein provided.

10.    Governing Law and Dispute Resolution. This Agreement shall be construed and governed by the laws of the State of California. Any dispute hereunder shall be litigated and tried in binding arbitration before the American Arbitration Association in Los Angeles, California, and Judgment by the AAA's all be binding and not subject to appeal or collateral attack. In connection with the AAA arbitration, the Investors shall by majority choose one arbitrator, Drakulic shall choose another arbitrator and these two arbitrators shall pick a third arbitrator which such third arbiter shall be the sole arbiter over the dispute.

11.    Entire Agreement, Amendments and Waiver. This Agreement constitutes the entire Agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations and understandings -- whether oral, written or both -- of the parties with respect to the subject matter hereof. In the case of this particular Agreement, there have been no prior or contemporaneous agreements, representations and understandings between or among the parties hereto, and the only agreement that formed the topic of negotiations and discussions is contained herein. The parties agree that this Agreement may not be modified and that no attempted modification by the parties shall be binding upon either party hereto unless contained in a written instrument executed by the party to be charged. Accordingly, this Agreement may not be so modified by a writing that is unsigned by the party to be charged and this Agreement may not be modified by any oral amendment, oral agreement or other oral modification. In fact, any oral amendment or written modification that remains unsigned by the party to be charged is invalid in that the parties intend that there is no consideration for any future promises that are not contained in writing and the parties hereto specifically agree that this be the case.

12.    Assignment. Neither this Agreement, any portion hereof nor any rights hereunder may be assigned or transferred by the Investors, without the prior written consent of Drakulic unless such assignment or transfer is made by the Investor by bequest or through inheritance or for estate planning purposes to, or for the benefit of, any spouse, ancestor, descendent or other family member of such Investor (other than David Mulberg). Notwithstanding the forgoing sentence, any transfer made pursuant to the exception contained therein must be noticed to Drakulic ten (10) business days prior to completion and Drakulic shall have the right to object if the purpose of the assignment or transfer is unlawful in any manner. Drakulic may freely assign the benefits of this Agreement within his sole and absolute discretion to any person except David Mulberg. This Agreement shall be binding upon and shall inure to the benefit of the permitted successors, licensees, assignees and transferees of the parties herein.



Initials _____

p.5

13.   Legal Advice. The parties hereby acknowledge that they have received independent legal advice from attorneys of their choice with respect to the advisability of executing this Agreement and the related documents effecting this transaction. Prior to the execution of this Agreement and in accordance with these opportunities, each party made all desired changes to this Agreement. Each party and their attorneys have made such investigation of the facts pertaining to this Agreement and of all of the matters appertaining thereto as they deemed necessary. Each party certifies that they have read this Agreement, and fully understand it and that they have executed it voluntarily, free of any duress, force, or undue influence of any party or any person.

14.   No Admission of Wrongdoing. Neither the execution of this Agreement nor the implementation of any terms hereof shall constitute an admission of wrongdoing on the part of any signatory to this Agreement.

15.   Transfer and Assignment of Rights. Upon the Closing hereof, the Investors stipulate, covenant and agree that: (a) All shares they ever owned in AHT prior to the Closing are thereby transferred, assigned and conveyed to the designee of Drakulic, and this Agreement shall constitute an assignment with respect to all shares claimed to be owned by the Investors in AHT prior to the Closing of this Agreement and also with respect to any shares actually owned by such Investors to the extent there is ultimately proven to be a difference between the claimed amount of shares owned and the actual amount of shares owned. After the Closing hereof, the designee of Drakulic shall conclusively be deemed to be the outright owner of all shares of AHT to which the Investors had a legal right prior to the Closing; and (b) All of the Investors' legal rights of any kind appertaining or relating in any manner to AHT -- and/or against any person or entity prior to the Closing that appertain or relate to AHT -- including, without limitation, rights appertaining to loans, extensions of credit or other items of any kind, are, too, hereby transferred, assigned and conveyed to the designee of Drakulic at the Closing.

16.   Confidentiality. The parties mutually covenant, agree, and promise that they shall treat this Agreement, excluding the fact of settlement but including its terms and conditions, the amount and type of consideration and any discussions surrounding its negotiations absolutely confidential. Each party mutually agrees and covenants that they shall not disclose, divulge or communicate any such confidential information to any person or entity without prior written consent of the other parties. The parties agree that if asked about the conclusion of the matters set forth in this Agreement, the parties will divulge only that the matter has been amicably resolved (except as otherwise provided herein). This paragraph shall not be breached to the extent that the disclosure of any information is (i) to secure compliance with or enforcement of the terms of this Settlement Agreement, (ii) in response to an order of a court of competent jurisdiction or subpoena issued under the authority thereof, (iii) made to the parties' legal counsel, board of directors, financial advisors, and/or tax consultants, subject to the same



Initials:

Sep 29 03 08:16a                                                              p.1

provisions of confidentiality as used herein, or (ii) provide for compliance with any federal or state securities law applicable to any term of this Agreement or as is otherwise required by law. However, the parties agree that, to the extent any party is served with a subpoena or court order, the parties shall within five business days communicate, both telephonically and in writing, the fact of such service, order, subpoena, or request to counsel for the other parties and to a representative of the other parties. Such communication shall be made so that the other parties will have the opportunity to determine to assert what rights they have to neutralize before prior to the ordered or subpoenaed or lawfully required party's response. Further, the parties agree to offer each other party, in the event of such order or subpoena or lawful requirement, the opportunity to assist in the preparation of such ordered, subpoenaed, or lawfully required response and/or to interview the involved party in advance of any disclosure. The parties agree to make themselves reasonably available to representatives of any party in the event that information or assistance is needed in connection with any potential or actual proceeding or investigation.

17. **Closing.** The Closing of this Agreement shall take place on October 23, 2002 at a place in Los Angeles County designated by Drakulic. At the Closing, Drakulic shall produce his original signature on this Agreement in exchange for: (a) the original signatures of all Investors to this Agreement, and (b) the fully and accurately completed Exhibit "A" and the delivery of the originals of all supporting documentation or affidavits surrounding the investments claimed to have been made by the Investors in AHT. Within 5 business days of the Closing hereof, Drakulic will produce an issuance instruction, addressed to the Company's transfer agent or designated issuance body, requesting that common shares in the amount opposite each individual Investor's name, as contained in Schedule D, be issued. Upon production by Drakulic of such request to Steven Verchick, the Investors shall forward to Verchick a check made payable to the Company in the amount of $34,000.00, within 3 business days, as provided for in paragraph 1 above. As soon as is reasonably practicable following the foregoing events, Drakulic shall provide notification to Verchick that he is in possession of the aforementioned share certificates and is prepared to exchange them for the $34,000.00 check. Within 2 business days thereafter, Verchick shall respond with notification that he has the check and the parties shall -- within 24 hours thereof -- exchange the check for the share certificates through a meeting between Verchick and Drakulic. In the event Drakulic produces the share certificates required to be produced under this Agreement and the Investors fail or refuse to produce the $34,000.00 check in the manner set forth above, the Investors shall receive no shares of stock in the Company but -- nonetheless -- the Mutual General Release Provisions set forth at Schedule "C" attached hereto shall be fully binding and enforceable as against all parties hereto irrespective of any fact, circumstance or other happening or event."

18. **Incorporation of Schedules.** The Schedules appended hereto are fully incorporated by reference as though fully set forth, and form binding obligations and representations hereunder.



Initials: _____

19.   Counterparts. This Agreement may be executed in counterparts and signal may be exchanged by facsimile, with all such counterparts taken as a whole constituting this Agreement.

IN WITNESS HEREOF, the parties hereto have themselves, or through their duly authorized representatives, executed this Agreement, as of the date first set forth above, such execution occurring and existing at the conclusion of all Schedules appended hereto.

*[Remainder of Page Intentionally Left Blank]*

Initials _____

Exhibit "E"

BORMAN AFFIDAVIT

I, the undersigned, declare that upon initialing each page of this Agreement and signing this Agreement, that I (i) paid valuable consideration to AEI for the purchase of securities as referenced on Schedule "A" below, (ii) that the consideration listed on Schedule A is the total amount of monies invested by me in AEI, and (iii) that the information set forth opposite my name on Schedule "A" below is true and correct, and that I am providing this affidavit as an inducement to Drakulic to enter into this Agreement.

I have personal knowledge of the following facts contained herein and on Schedule "A" below and if called to testify I could and would competently testify thereto based upon my personal knowledge.

Not only have I signed this affidavit below and printed my name, but I have signed this Agreement at its conclusion and I am ratifying my signature approving the content of this affidavit.

Executed this ___ day of October, 2002.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Signature: _____

Print Investor Name: _____

Initials: _____

Settlement Agreement and Mutual General Release

## SCHEDULE "A"

List of the Clients and their Representations and Supporting Documentation

| Name (investor) | Amount of Investment (AIII) | other |
|---|---|---|
| Tom Byers | $ 20,000.00 | |
| Stephen Caughel | $ 150,000.00 | |
| Mark Karz | $ 20,000.00 | |
| Steve Levelihan | $ 10,000.00 | |
| Bill Lemlen | $ 10,000.00 | |
| Thomas Mazurek | $ 10,000.00 | |
| Steve Neuberger | $ 5,000.00 | |
| Jeff Sawyer | $ 35,000.00 | |
| Walt Sawyer | $ 50,000.00 | |
| Stephen Verchick | $ 125,000.00 | |
| Tom Zinna | $ 190,000.00 | |
| Bell Zwerdling | $ 25,000.00 | |
| Paul Wilhelm | $ 30,000.00 | |
| Rob Chezy | $ 25,000.00 | |
| Gary Sabonjian | $ 22,500.00 | |
| Barron St. John | $ 75,100.00 | |
| Jeff Cowan | $ 22,500.00 | |
| **TOTAL INVESTMENT** | **$ 775,100.00** | |

Drakula's Acknowledgment of Receipt of Copies of Confirmatory Documentation from Investor Group

Initials: _____

Settlement Agreement and Mutual General Releases

## SCHEDULE "B"

### Standards of Public Company Per Paragraph 2 of the Agreement

The public company referenced in paragraph 2 of the Agreement, attached hereto, shall have the following features:

1.  As of the date of the Agreement, attached hereto, it shall be authorized under the rules of the National Association of Securities Dealers to trade on the OTCBB marketplace.

2.  As of the date of the Agreement, attached hereto, it shall have no more than 10,000,000 common shares issued and outstanding, with such number including any and all outstanding warrants.

3.  As of the date of the Agreement, attached hereto, and giving full effect to the conveyances given in paragraph 2 of the Agreement. It shall have taken all reasonable measures to maximize its ownership over all right, title and interest in and to all of the technologies with the sole exception of the technologies licensed to Teledyne as referenced in Recital B of the Agreement, attached hereto.

4.  As of the date of the Agreement, attached hereto, it shall make simultaneously therewith or in the ordinary course of business thereafter, or have made, a press release stating that it has acquired certain rights from a third party with such rights related to the technologies.

The Investors acknowledge and agree that – other than the standards referenced in this Schedule "B" – the public company referenced in paragraph 2 of the Agreement shall merely be a "shell," and that the Investors hereby waive, relinquish, disavow and give up, from now until forever, any right to object to the condition, state, form, order or other circumstances surrounding or appertaining in any manner to the public company referenced in paragraph 2 of the Agreement, including, without limitation, the state of the public company's assets, the state of the public company's liabilities, the state of the public company's earnings (of which there are none), whether or not the public company has acceptable physical plant or equipment, and any facts whatsoever having anything to do with the public company.

The following shares being tendered to the Investors as set forth herein represent a total of three percent (3%) of the issued and outstanding shares of the public company.

### Investor Names and Amount of Shares in Public Company

| Name of Investor | Number of Shares Received in Public Company |
| --- | --- |
| Tom Byars | 7,641 |
| Bernard Carneci | 30,207 |
| Mark Kutz | 7,641 |

Initials

| | |
|---|---|
| Steve Lenox | 5,570 |
| B. Horton | 42 |
| Henera Margeak | 905 |
| Steve Neuberger | 1,980 |
| Jeff Sawyer | 19,724 |
| Will Sawyer | 18,800 |
| Stephen Verchick | 49,000 |
| Tom Zenna | 74,492 |
| Bek Zwerdling | 9,801 |
| Paul Wilhelm | 11,781 |
| Rob Cherry | 9,801 |
| Gary Salomons | 8,821 |
| Barron St. John | 29,444 |
| Jeff Cowan | 8,821 |
| **TOTAL** | **303,881** |

Initials

Schedule B

Form of Agreement by Public Company

[Public Company's Letterhead]

Date

[Name of Investor]

Dear [Investor]

This confirms that we acknowledge an obligation to pay you the amount of money set forth opposite your name on Schedule "A" of the Settlement Agreement and Mutual General Release between the Investors and Budimir Drakulic ("Settlement Agreement"), and such obligation shall be fully binding against us in the following events, as if only the following events:

A.   You have not breached any agreement, warranty, representation or understanding, express or implied, under the Settlement Agreement;

B.   With the exception of David Mulberg or Budimir Drakulic or any Investor, no shareholder or alleged shareholder of Advanced Heart Technologies, Inc. shall have filed any lawsuit, claim, arbitration or other legal proceeding (hereinafter "legal claim(s)") against us other than legal claims involving the repayment of an amount of money less than one hundred thousand dollars ($100,000.00);

C.   We have raised in excess of $2 million in connection with any public offering, private offering, private placement or other transactions involving an equity financing with us, after which we agree that – with respect to all amounts raised at any time by us – we shall pay to all Investors who have executed the Settlement Agreement an amount of money equal to four percent (4%) of all money raised until the Investors are repaid in full the amount of money set forth opposite their names as set forth on Schedule "A." Notwithstanding any such payments, the payment of such monies will not affect the number of shares you own at such time.

Further, this confirms that our obligation hereunder shall in no way cancel, supersede or modify in any way the shares of common stock you have received under and pursuant to the Settlement Agreement.

Sincerely,

[Name of Public Company]

By: Chief Executive Officer

Initials _____

Settlement Agreement and Mutual General Release                                                12

SCHEDULE ___

Mutual General Release Agreement

In consideration of and in reliance upon the foregoing Agreement and acknowledging that the foregoing Agreement and all representations made therein are true and correct, and shall always represent fully binding contractual obligations, each of the parties hereto, the parties to this Agreement hereby agree that this Exhibit (Mutual General Release) is operating and binding upon the full execution of this Agreement, and in the event that either party breaches any or all of its proposed to comply with this, the provisions set forth herein are fully binding and enforceable irrespective of whether or not the Closing of this Agreement has actually occurred.

With the proviso that neither David Mulberg nor any other person having any direct or indirect affiliation or involvement with _____ has been for shall be released in any way by this Agreement unless they are either Drakulic or one of the parties of the Investors.

Mutual General Releases

a.      The Investors, for themselves and for their shareholders, officers, directors, legal predecessors, successors, assigns, and those who at any time purport for any reason to be acting in association with them or on their behalf, (collectively "Investor Group"), do hereby forever and finally release, relieve, acquit remise absolve and discharge Bodnar Drakulic and his respective past and present employees, officers, partners associates, affiliates, subsidiaries, related companies, joint venture partners, successors or persons to which he has sold or transferred any personal property or technologies (e.g., technology, patents, trade secrets, automobiles, or other personalty) or to which such successor has in turn sold or transferred any personal property or technologies, directors, agents, representatives, attorneys, shareholders, spouses, children, and former spouses (collectively "Drakulic Group") from any and all losses, claims, debts, liabilities, demands, obligations, promises, acts, omissions, agreements, costs and expenses, damages, injuries, suits, actions and causes of action, of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, that the Investor Group may have against the Drakulic Group (or against their past and present employees, officers, partners, associates, affiliates, subsidiaries, related companies, joint venture partners, successors or persons to which he has sold or transferred any personal property or technologies (e.g., technology, patents, trade secrets, automobiles, or other personalty)) or to which such successor has in turn sold or transferred any personal property or technologies, directors, agents, representatives, attorneys, shareholders, spouses, children, and former spouses) based upon, related to, or by reason of any matter, cause, fact, act or omission occurring or arising at any moment from the beginning of time to the last date of execution hereof, including, without limitation, matters existing by reason of any contract (express or implied in fact or implied in law), lien, liability, cause, fact, thing, act or omission whatever, occurring or existing at any time to and including the last date of execution hereof. Each person released by operation of this Agreement is an intended third party beneficiary of this Agreement.

b.      Drakulic, for himself and for his shareholders, officers, directors, legal predecessors, successors, assigns, and those who at any time purport for any reason to be acting in association with him or on his behalf, does hereby forever and finally release, relieve, acquit, remise, absolve and discharge the Investor Group and their respective past and present employees, officers, partners, associates, affiliates, subsidiaries, related companies, joint venture partners, directors, agents, representatives, attorneys, shareholders, spouses, children, and former spouses from any and all losses, claims, debts, liabilities, demands, obligations, promises, acts, omissions, agreements, costs and expenses, damages, injuries, suits, actions and causes of action, of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, that Drakulic may have against the Investor Group (or against their past and present employees, officers, partners, associates, affiliates, subsidiaries, related companies, joint venture partners, directors, agents, representatives, attorneys, shareholders, spouses, children, and former spouses) based upon, related to, or by reason of any matter, cause, fact, act or omission

Initials _____

            P 14

occurrence of any manner from the beginning of time to the last date of execution hereof, including, without limitation, or matters existing by reason of any contract (express or implied or based or implied in law), lien, liability, cause, fact, thing, act or omission whatever, accruing or existing at any time to and including the last date of execution of this ... such persons released by operation of this Agreement as an intended third party beneficiary of this Agreement.

... As used herein, the term "related companies" shall mean Any persons, companies, ... relationship, operation of this Agreement has an ownership interest in or a legal affiliation with, such as ... relationship, to illegal ... held or referred to as a partnership interest (in the case of a partnership), a member, unit interest or interest in ... (in the case of a limited liability company), a stock interest (in the case of a corporation), a joint venture interest (in the case of other contractual relationships) or any other interest recognized under the law, it being the intention of the parties that all "related companies" of the persons released above shall be this document be released as well from any liability and shall receive the same protection under this Agreement as has been provided for the persons actually named herein.

       d.       Under no circumstances does any provision of this Agreement or of these Mutual Release Provisions operate in any manner to release, in any way, David Mulberg or any person affiliated or related in any manner to ALL unless such person is an actual signatory to this Agreement.

       ff.       Finality and Scope of Releases. The parties hereto acknowledge and agree that it is their intention, through this Agreement and the releases set forth in this Schedule "C," to fully, finally and forever settle and release each other from all those matters released herein, and all claims related thereto, which do now exist, may exist or heretofore have existed or may hereafter exist. It is the intent of the parties to this Agreement to release each other from claims or causes of action arising from facts that were willfully, wrongfully, or tortuously concealed from the aggrieved party, excepting any such claims or causes of action arising out of the affirmative obligations contained in the Body of the Agreement.

       III.      **Releases of Unknown or Unsuspected Claims.** THE PARTIES HAVE BEEN INFORMED BY THEIR RESPECTIVE ATTORNEYS AND ADVISORS ABOUT CALIFORNIA CIVIL CODE SECTION 1542, AND THE PARTIES ACKNOWLEDGE THAT THEY ARE FAMILIAR WITH AND HEREBY EXPRESSLY WAIVE THE PROVISIONS OF THIS SECTION, AND ANY SIMILAR STATUTE, CODE, LAW OR REGULATION OF ANY STATE IN THE UNITED STATES TO THE FULLEST EXTENT THAT THEY MAY WAIVE SUCH RIGHTS AND BENEFITS. SECTION 1542 OF THE CALIFORNIA CIVIL CODE PROVIDES:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

       IV.      **Final Accord and Satisfaction.** This Agreement and the releases contained herein are intended to be final and binding between the parties hereto and are further to be effective as a full and final accord and satisfaction between the parties hereto, and each party to this Agreement expressly relies on the finality of this Agreement as a substantial, material factor inducing that party's execution of this Agreement

       V.      **The Effect of Discovery of Different or Additional Facts.** With specific respect only to the Mutual General Releases set forth in this Schedule "C," the parties hereto acknowledge and agree as follows:

       That they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in

Initials _____

different from those which they now know or believe to be true, or related or associated parties in addition to or different from those which are listed herein and which the parties believe to exist pertaining to the matters released hereto. Nevertheless, it is the intention of the parties hereto, through this Agreement and the releases given to fully, finally, and forever settle and release all such matters, and all claims and parties related thereto, which do now exist, may exist in the future or heretofore have existed. In furtherance of such intention, the releases herein given shall be and remain in effect as a full and complete release of such matters and parties notwithstanding the discovery or existence of any such additional or different claims or facts or parties related thereto by the parties hereto. In entering into these releases, the parties hereto are not relying upon any statement, representation, or document on promise of any other parties, except as expressly stated in this Agreement. It is the intent of the parties to this Agreement to release each other from claims or causes of action arising from facts that were willfully, wrongfully, or tenaciously concealed from the aggrieved parties.

VI.    **Assumption of Risk.** With specific respect only to the Mutual General Releases set forth in this Schedule "C," the parties hereto acknowledge and agree as follows:

That no facts or representations are ever absolutely certain; accordingly, each party hereto assumes the risk of any misrepresentation, concealment or mistake, and if any party hereto should subsequently discover that any fact included party relied upon in entering into this Agreement was untrue, or that any fact was concealed from that party, or that any understanding of the facts or the law was incorrect, said party shall not be entitled to set aside this Agreement by reason thereof, regardless of any claim of fraud, misrepresentation, promise made without the intention of performing it, fraud in the inducement, concealment of fact, mistake of fact or law, or any other circumstances whatsoever. This Agreement and the releases contained herein are intended to be final and binding upon the parties hereto, and each of them, and is further intended to be effective as a full and final accord and satisfaction among the parties hereto, regardless of any claim of fraud, misrepresentation, promise made without the intention of performing it, fraud in the inducement, concealment of fact, mistake of fact or law, or any other circumstances whatsoever. Each party relies upon the finality of this Agreement and the releases herein as a material factor inducing the party's execution of this Agreement.

VII.    **Generality and Specificity of Releases; Covenant Not to Sue or Make Claims.** With specific respect only to the Mutual General Releases set forth in this Schedule "C," the parties hereto acknowledge and agree as follows:

The parties hereto intend these Mutual General Releases to be construed in the broadest possible terms so that the effect of this Agreement is that the persons released hereby may not be sued by the persons releasing them hereby, whether directly or indirectly, and no claims may be made related to such releases whether by way of offset or otherwise or indeed in any manner and for any reason, under any theory of fact, under any theory of law, under any alleged set of facts, under any alleged reading of the law and under or pursuant to any claim of any kind, including (without limitation) claims for negligence, breach of contract, fraud, theft, breach of fiduciary duty, lender liability and indeed for any of the disputes set out in any of the recitals set forth above.

VIII.    **Incorporation by Reference.** All provisions of the foregoing Agreement are incorporated herein by reference as though fully set forth at length.

Initials _____

Settlement Agreement and Mutual General Release

15

Signatures Beginning on Next Page

"ORARE 'S-"

by. _____
    *BEDMOR DRATE I IC*

#### SIGNATURES OF MEMBERS OF INVESTOR GROUP APPROVING SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASES

**THE FOREGOING SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASES IS HEREBY APPROVED, RATIFIED AND ACCEPTED IN FULL:**

_____

By: Tom Byers

Drivers License # _____

Address: _____

_____

Phone: _____

Fax: _____

Company Name and Title of Signor
(If Applicable): _____

Initial: _____

By: Bernard Fausel

Drivers License #:

Address:

Phone:

Fax:

Company Name and Title of Signer
(If Applicable):

By: Mark Katz

Drivers License #:

Address:

Phone:

Fax:

Company Name and Title of Signer
(If Applicable):

By: Steven Lepatner

Drivers License #:

Address:

Phone:

Fax:

Company Name and Title of Signer
(If Applicable):

Initials

Settlement Agreement and Special Limited Releases

By: [illegible]

Drivers License #:

Address:

Phone:

Fax:

Company Name and Title of Signer
(If Applicable):

---

By: Mark Katz

Drivers License #:

Address:

Phone:

Fax:

Company Name and Title of Signer
(If Applicable):

---

By: Steven Lepatner

Drivers License #:

Address:

Phone:

Fax:

Company Name and Title of Signer
(If Applicable):

Initials _____

Settlement Agreement and Mutual General Release